UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOSEPH VEGA,

               Plaintiff,                                         Case No.:16cv06432 (RA)

      - against -                                       **AMENDED COMPLAINT**

NEW YORK CITY POLICE OFFICER JOHN            Jury Demanded
SANTUOSSO, NEW YORK CITY POLICE
OFFICER ROSS YUENGST, and THE CITY OF
NEW YORK,

               Defendants.
------------------------------------------------------------x

      Plaintiff, by his attorney, WILLIAM A. THOMAS, upon information and belief, alleges the following:

## PARTIES

      1.      That at all times herein mentioned, Plaintiff JOSEPH VEGA, has been and remains a resident of the City and State of New York, County of Bronx.

      2.      Defendant NEW YORK CITY POLICE OFFICER JOHN SANTUOSSO and was at all times relevant employee of the NEW YORK CITY POLICE DEPARTMENT, working out of the 51st Precinct in the Bronx 167 E. 51ST, New York, NY 10022.

      3.      Defendant NEW YORK CITY POLICE OFFICER ROSS YUENGST, Shield No. 13761, was at all times relevant an employee of the New York City Police Department and currently works out of the 50th Precinct, 3450 Kingsbridge Avenue, Bronx, NY 10463

      4.      Defendant THE CITY OF NEW YORK is a municipal corporation organized under the laws of the State of New York and has offices located at 100 Church Street, New York, New York 10007.

## FEDERAL JURISDICTION AND VENUE

5. This is a civil rights action in which plaintiff seeks relief for defendants' violation of his rights, privileges, and immunities pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First, Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), et seq., ("Title VI"), and the Constitution and laws of the State of New York pursuant to 28 U.S.C. § 1367. The Defendants engaged in a course of conduct designed to intimidate Plaintiff through the use of their authority, falsely arresting Plaintiff, threatening Plaintiff and using physical violence against the Plaintiff when he protested against their actions. Moreover, they did so in furtherance of an express and affirmative municipal policy.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) and (c) as the Defendants are located in the Southern District of New York and the events giving rise to the claims occurred in the Southern District of New York.

## FACTS

7. On or about March 7, 2015, 4:45 p.m. the Plaintiff was lawfully present inside a park near Sedgwick and Resevoir Avenues, Bronx, New York.

8. Plaintiff was subjected to a search and arrested without a warrant or probable cause by defendants SANTASUOSSO and YUENGST.

9. In response to Plaintiff's complaints that he was being arrested unlawfully, Plaintiff was illegally assaulted, battered, tripped to the ground, and handcuffed by the defendants SANTASUOSSO and YUENGST, who were employees of Defendant NEW YORK CITY POLICE DEPARTMENT acting at all times under color of state law, causing plaintiff

injuries, including but not limited to a panic attack and great anxiety at the moment of occurrence.

10. Defendants illegally and forcibly kidnapped Plaintiff and imprisoned him against his will at the 51st Precinct in the Bronx. Plaintiff was conscious of his confinement, did not consent to such confinement, and such confinement was not otherwise privileged as there was no probable cause for an arrest.

11. Plaintiff was subject to inhumane treatment and was forced to have his fingerprints examined, a DNA sample taken, and was photographed.  After an imprisonment of more than three hours Plaintiff was released from custody with a desk appearance ticket falsely charging him with use of marijuana. Defendants also notified plaintiff's employer, the New York City Department of Education, of his arrest for a drug-related charge.

12. On or about March 25, 2015, the charges were dismissed in a proceeding in Criminal Court, Bronx County.

13. As a result of the charges, and notwithstanding their baselessness and subsequent dismissal, Plaintiff was suspended from his job without pay and has suffered permanent professional and reputational damages as well as emotional damages.

14. During the events related herein, the Defendants were acting under color of law in violating Plaintiff's rights under the Constitution, Federal Law, and New York State law.

15. Plaintiff was shocked, alarmed and distressed and continues to be emotionally disturbed by the matters complained of herein.

16. Plaintiff was injured by the reason of the unlawful, intentional, violent, reckless or negligent acts of the defendants.

17. Defendants, through their unlawful, intentional, violent, reckless or negligent acts caused the Plaintiff to be unlawfully imprisoned.

18. Defendants engaged in a policy and practice of searching Plaintiff without a reasonable articulated suspicion of criminality or warrant as required by the Fourth Amendment.

19. Pursuant to the illegal search Plaintiff experienced emotional distress, pain and suffering, loss of quality and/or enjoyment of life, and all other damages to which the claimant is entitled to by case law and statute.

20. Plaintiff, an Hispanic male, has the physical characteristics of, and was a member of a protected class as a minority, and was subjected to the treatment described herein because the Defendants considered him to be a member of the protected class or minority.

21. Defendants' actions in treating Plaintiff differently from "European Americans" or "whites" is a violation of the Plaintiff's rights under the Constitution, federal statute, and state law.

FIRST CLAIM FOR RELIEF, AGAINST THE INDIVIDUAL OFFICERS

22. Plaintiff repeats and reiterates all previous allegations as if same were fully set forth.

23. Defendants NEW YORK CITY POLICE OFFICER JOHN SANTUOSSO and NEW YORK CITY POLICE OFFICER ROSS YUENGST acting at all times under color of state law, deprived plaintiff of his rights under the United States Constitution, including the right not to be searched without probable cause, the right not to be falsely arrested, the right not to be falsely imprisoned, and the right not to be professionally defamed.

24. Plaintiff has suffered damages as a proximate consequence of the aforesaid actions, all of which occurred in violation of Civil Rights Act of 1871, 42 U.S.C. § 1983, the

First, Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), et seq., ("Title VI"), and the Constitution and laws of the State of New York pursuant to 28 U.S.C. § 1367.

SECOND CLAIM FOR RELIEF, AGAINST THE CITY OF NEW YORK

25. Plaintiff repeats and reiterates all previous allegations as if same were fully set forth.

26. Defendant the CITY OF NEW YORK, acting by and through NEW YORK CITY POLICE DEPARTMENT, previously engaged in a practice and policy of seizing and arresting innocent citizens, and more particularly African-American and Hispanic males, without any cause or warrant as required by the Fourth Amendment.

27. Such policy, which takes the form of arrest quotas and/or other explicit pressures imposed on officers by their superiors and high-ranking personnel within the New York City Police Department (NYPD), has been expressly conceded to exist in public statements of New York City Police Officers, and was in effect at the time of plaintiff's arrest.

28. Defendants NEW YORK CITY POLICE OFFICER JOHN SANTUOSSO and NEW YORK CITY POLICE OFFICER ROSS YUENGST were following the policy of Defendant the CITY OF NEW YORK as promulgated by senior officers at the 51st Precinct when they falsely arrested Plaintiff, which commanding officers included, without limitation, one Lieutenant McMahon, the patrol commander, and one Lieutenant Foder, the special operations commander.  Additionally, on information and belief the commanding officers of the 51st Precinct were in turn acting in furtherance of a policy agreed upon and articulated to them by NYPD district commanders and high-ranking department officials; at a minimum, such high-level policymakers at the NYPD were consciously aware of such quotas at the precinct level and

repeatedly condoned them over a period of many years. The resulting pattern of continuous misconduct was sufficiently widespread as to acquire the force of law.

29. The existence of arrest quotas over the last decade, while vigorously denied by NYPD officials such as the current commissioner, has repeatedly been alleged by more than a dozen NYPD officers in at least four separate lawsuits filed in this Court and the United States District Court. Moreover, such quotas, while sometimes euphemistically characterized as "performance standards" or "productivity goals," continue unabated to to the present time and in any event were in effect at the time of plaintiff's arrest in March, 2015. Because the quotas have been alleged to exist by officers attached to precincts throughout New York City, plaintiff alleges that same exist as a matter of department policy articulated at the highest levels, whether or not they have been reduced to writing and whether or not publicly acknowledged by high-ranking NYPD officials.

30. For example, in an action in this court, veteran Officer Craig Matthews alleged that beginning in 2008 he and other officers in the Bronx's 42nd Precinct were pitted against each other by their commanders to see who could make the most arrests, carry out the most stop-and-frisk actions and issue the most summonses. Official department reports divided officers into those who made or exceeded goals set by mid-level supervisors and those who did not. In the reports, officers who didn't meet goals were highlighted in red. See Matthews v. City of New York, 12 CV 1354 (PAE). Similarly, Officer Adrian Schoolcraft of the 81st Precinct recorded his supervisors telling him and his fellow officers in the Bedford-Stuyvesant neighborhood of Brooklyn to meet a series of stop-and-frisk and arrest quotas. See Schoolcraft v. City of New York, 10 Civ. 6005 (RWS).

31. Similarly, in an action in the Eastern District of New York, Michael Birch, a 16-year veteran, alleged that while with the NYPD's Transit District 34, he endured retaliation from supervisors for five years, including poor performance evaluations, after he refused to violate the civil rights of Blacks and Latinos by subjecting them to illegal stops and searches, as well as false arrests, in order to meet his unit's monthly per-officer arrest and summons "quota." Birch alleged in his lawsuit that even though the NYPD denied their existence, the illegal "performance goals" were "a highly developed system designed to generate revenue and pecuniary gains to the detriment of citizens of color." See Birch v. City of New York, 16 Cv. 00034 (BC). See also Floyd v. City of New York, 813 F. Supp.2d 417 (S.D.N.Y. 2011) (denying defendants' summary judgment motion on plaintiffs' allegations that the NYPD supervisors had a widespread practice of imposing quotas on officers).

32. More recently, in an action currently pending in this Court, a group of thirteen officers--Edreweene Raymond, Adhyl Polanco, Pedro Serrano, Sandy Gonzalez, Ritchie Baez, Julio Diaz, Felicia Whitely, Roman Goris, Derick Waller, Kareem Abdullah, Olayokun Olagoke and Widmarc Pierre--variously attached to the 40th, 41st, 43rd, 66th, 75th, and 77th Precincts, Transit District No. 32 and Housing Bureau PSA-1, have alleged at length that they were explicitly required by precinct commanders to enforce numeric arrest quotas and suffered various forms of retaliation when they objected that same would have disproportionate consequences for minorities, who predominate in the relevant precincts in the Bronx and Brooklyn. See Raymond et al. v. City of New York, 16 CV 8885 (LTS). Among the many notable allegations in their action is that, as reported in the New York Daily News on December 15, 2010, officers assigned to the 79th Precinct were so angry over alleged ticket quotas that they threatened not to write summonses for a 24-hour period in protest; in response, Deputy Chief Michael Marino marched

into the Bedford-Stuyvesant precinct at roll call with a deputy inspector and read officers the riot act.  "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Another source said Marino vowed to transfer people, as he had done when he was the commanding officer of the 75th Precinct in East New York. In 2006, an arbitrator ruled that Marino broke state labor laws by punishing officers who did not meet ticket and arrest quotas.  In short, and as alleged at length in the Raymond Action,  the quotas are, if not expressly promulgated by top NYPD brass, then nonetheless condoned and indeed actively enforced by no less than an deputy chief.  Accordingly, a custom, pattern, practice and usage of actively enforcing arrest quotas has been affirmatively propounded, and in any event knowingly maintained, by persons in policymaking positions within the NYPD.

33.     While a policy of quotas effectively forcing officers to engage in false arrest is self-evidently a constitutional violation, and notwithstanding that the effect of such policies in minority-heavy neighborhoods is perforce to visit such violations upon minorities, plaintiff additionally alleges that the City of New York, by high-ranking NYPD officials, actively targets African-American and Hispanic males for purposes of such arrest.  Indeed, such allegations have already been made by the plaintiffs in the Matthews, Birch, Floyd and Schoolcraft actions, and a plaintiff in the Raymond action,  Pedro Serrano, has publicly stated that "They tell you this to your face: Blacks and Hispanics between 14 and 21—they must get stopped."  See WNBC I-Team Interview of the "NYPD 12,"  March 31, 2016, http://www.nbcnewyork.com/investigations/NYPD-Officers-Arrest-Quota-Exclusive-Interview-Pressure-Numbers-374077091.html.  Unconstitutional to begin with, the arrest quotas are doubly invidious for being coupled with racial profiling.

**WHEREFORE,** the plaintiff demands judgment against Defendants for THREE MILLION DOLLARS ($3,000,000.00) in compensatory damages and, because defendants' actions were at all time willful, wanton and malicious, punitive damages in amount to be determined by a jury, together with attorney's fees pursuant to 42 U.S.C, and the costs and disbursements of this action.

Dated:   New York, New York
         June 21, 2017

*/s/ William A. T.*

_____

WILLIAM A. THOMAS (0116)
Attorney for Plaintiff
89 Fifth Avenue, Suite 900
New York, New York 10003
(917) 693-3981
wthomas@watlegal.com